**FILED**



4:13 pm, 10/13/23

**Margaret Botkins**
**Clerk of Court**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

---

BRETT HEMRY, Individually and as
Next Friend of F.M.H., GENALYN
HEMRY, Individually and as Next
Friend of F.M.H., and F.M.H., a minor
child,

        Plaintiffs,

    v.

ROBERT R. COOKE, BRETT M.
TILLERY; and BRADLEY M. ROSS,
MEHRAN AZIZIAN,

        Defendants.

Case No.  21-CV-00136-ABJ

---

## ORDER GRANTING FEDERAL DEFENDANTS' *SECOND MOTION TO DISMISS* [ECF No. 69] AND STATE DEFENDANTS' *MOTION FOR JUDGMENT ON THE PLEADINGS* [ECF No. 65]

---

THIS MATTER comes before the Court on Federal Defendants' *Second Motion to Dismiss* (ECF No. 69) and State Defendants' *Motion for Judgment on the Pleadings* (ECF No. 65). After heeding a decision from the Tenth Circuit Court of Appeals,[1] reviewing the *Motions*, the filings, the applicable law, and being otherwise fully advised, the Court finds Federal Defendants' *Second Motion to Dismiss* and State Defendants' *Motion for Judgment on the Pleadings* are both GRANTED.

---

[1] *Hemry v. Ross*, 62 F.4th 1248 (10th Cir. 2023) (reversing and remanding the district court's denial of qualified immunity for defendants).

# BACKGROUND

A regrettable case of mistaken identity resulted in a harrowing traffic stop in Yellowstone National Park. The Hemry family, on vacation from Independence, Missouri, was held at gunpoint by two park rangers, swarmed by a slew of local law enforcement officers, and interrogated for the better part of an hour. ECF No. 1 at 2–3. Following the incident, the Hemrys were sent on their way without a substantive explanation or an apology. *Id.*

The impetus for the stop was a report from a park employee on the morning of July 20, 2017. *Id.* The employee alerted the National Park Service ("NPS") they had seen and spoken to Gerald Michael Bullinger—a fugitive, already known to the NPS, alleged to have committed a triple homicide in Idaho—near the park's East entrance.[2] The employee also provided a description of Bullinger's car (a white Toyota with license plate number: DN9F6M). *Id.* In fact, the employee had seen and spoken to Brett Hemry, a Missourian-tourist on vacation with his wife, Genalyn, and F.M.H., their seven-year-old daughter (collectively "Plaintiffs" or "Hemrys"). *Id.* A passing resemblance was enough for the employee to confuse Mr. Hemry with Bullinger.[3]

An alert, based on the employee's misinformation, circulated among state and federal law enforcement in the area, including the two park rangers in this action: Bradley

---

[2] *Id.* at 1252.

[3] "Bullinger was described as a grey-haired man in his sixties, standing six feet one inch and weighing 240 pounds." ECF No. 70 at 2; *Hemry* 62 F.4th at 1252. ("An officer explained to Mr. Hemry that they were on the lookout for a murder suspect and displayed a picture of Bullinger, *who shared Mr. Hemry's light-colored hair*.") (emphasis added).

M. Ross and Mehran Azizian (collectively "Federal Defendants"). When rangers Ross and Azizian saw the Hemrys leaving the park, they followed them. After noticing the rangers closely-tailing, Mr. Hemry pulled over, approximately sixteen miles east of the park entrance. *Id.* ¶ 25.

Guns drawn, rangers Ross and Azizian exited their vehicle. *Id.* ¶ 27. The pair held the Hemrys at gunpoint and instructed Mr. Hemry, via their PA system, to drop his car keys out of the window. *Id.* ¶ 28. Mr. Hemry complied, and the family was instructed to place their hands on the interior roof of the car. *Id.* The rangers kept their guns trained on the Hemrys (their hands still raised) for about half an hour until local law enforcement from the Park Country Sheriff's Office and more NPS rangers arrived. *Id.* ¶¶ 29–30.

After the deputies and rangers arrived, Mr. Hemry and then Mrs. Hemry were handcuffed in turn and placed in separate law enforcement vehicles and questioned. *Id.* ¶¶ 34–35. F.M.H. remained in the car for another half-hour; during that time, officers kept guns pointed at the vehicle. *Id.* Eventually, the rangers and officers were satisfied that Mr. Hemry was in fact not the fugitive, and they told the Hemrys they were free to go. *Id.* ¶ 37. Following the incident, the Hemrys filed suit against Federal Defendants, two named state defendants, and several "John Doe" Defendants for damages under *Bivens*,[4] § 1983,[5] and several Fourth Amendment theories. ECF No. 70 at 3; *See* ECF No. 1.

## PROCEDURAL HISTORY

---

[4] *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

[5] 42 U.S.C. § 1983.

Plaintiffs filed their complaint on July 19, 2021. *See* ECF No. 1. The original defendants in the suit included Ross and Azizian, Park County Sheriff's Department officers, Brett Tillery and Robert Cooke ("State Defendants"), and twenty unnamed defendants ("Unnamed Defendants" or "John Does"). *Id.* On September 28, 2021, Federal Defendants and State Defendants filed separate motions to dismiss. ECF No. 14; ECF No. 15. On November 12, 2021, this Court entered a joint order granting in part and denying in part State and Federal Defendants' motions to dismiss. *See* ECF No. 31. The Court also dismissed all Unnamed Defendants from the action because the Plaintiffs failed to meet their burden of specificity under 42 U.S.C. § 1983.[6] *Id.* at 8. This dismissal left only the four named defendants: Ross, Azizian, Tillery, and Cooke (collectively hereinafter "Defendants"). *Id.* at 8 n.4.

The Court went on to address whether State and Federal Defendants could assert qualified immunity. *Id.* at 8–22. The Court began with Federal Defendants finding Ross and Azizian were "entitled to qualified immunity on Mr. Hemry's unlawful arrest/false imprisonment claim[,]" but they were "not entitled to qualified immunity on Mrs. Hemry's unlawful arrest/false imprisonment claim at this stage of proceedings." *Id.* at 16. The Court found the same for State Defendants. *Id.* at 16–17. The Court also found that Defendants were not entitled to qualified immunity on Plaintiffs' excessive force claim. *Id.* at 20. Once the Court found that Defendants could not assert qualified immunity as to Mrs. Hemry's

---

[6] "Plaintiffs complaint falls short of this standard because they fail to differentiate the allegations against various unnamed officers. [] In fact, in most instances the complaint does not even specify whether the unnamed officer was a state or federal officer. For that reason, all unnamed Defendants are dismissed without prejudice because Plaintiffs have not adequately described them or attribute[d] specific acts to them." ECF No. 31 at 8.

4

unlawful arrest and false imprisonment claims, nor could they assert qualified immunity

on the Hemrys' excessive force claim, it held that the motions to dismiss those claims were

denied. *See id.*

On January 10, 2022, Federal Defendants filed a notice of appeal. ECF No. 35. In

their appeal, Federal Defendants challenged this Court's denial of qualified immunity. *Id.*;

ECF No. 70 at 3.  After reviewing ECF No. 31, the Tenth Circuit Court of Appeals reversed

finding that Ross and Azizian were entitled to assert qualified immunity on Mrs. Hemry's

false arrest and false imprisonment claims and on Mr. and Mrs. Hemry's excessive force

claims. *Hemry*, 62 F.4th at 1257, 1260.

## LEGAL STANDARDS

### I.      12(b)(6) Motion to Dismiss

A 12(b)(6) motion to dismiss requires the defendant to demonstrate the plaintiff has

failed to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To

survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted

as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Id.*

That is, to be *plausible*, "[t]he complaint does not need detailed factual allegations,

but the factual allegations must be enough to raise a right to relief above the speculative

level." *Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, 956 F.3d 1228,

1234 (10th Cir. 2020) (quoting *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009)).

## II.     12(c) Judgment on the Pleadings

As Federal Rule of Civil Procedure 12(c) articulates: "[A]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). As is well established in the Tenth Circuit, a motion for judgment on the pleadings is treated as a Rule 12(b)(6) motion to dismiss. *See Atl. Richfield Co. v. Farm Credit Bank*, 226 F.3d 1138, 1160 (10th Cir. 2000).

## III.   Qualified Immunity

As the Supreme Court has noted, the doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine shields "government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In this way, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

When a defendant asserts qualified immunity, the burden is on the plaintiff to show: "(1) the defendant violated his constitutional rights; and (2) the law was clearly established at the time of the alleged violation." *Soza v. Demsich*, 13 F.4th 1094, 1099 (10th Cir. 2021).

The "clearly established" language refers to a law or precedent that is explicit enough, so a "reasonable official would understand that what [they are] doing is unlawful. In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal citations and quotation marks omitted).

As the Tenth Circuit noted in *Soza*: "For purposes of qualified immunity, law is clearly established if Supreme Court or Tenth Circuit precedent, or the weight of authority from other circuits, would put reasonable officers in the defendants' position on notice they were violating the Fourth Amendment." *Soza*, 13 F.4th at 1099 (internal citations omitted). This does not require a prior case with "precisely the same facts," but rather, "[t]he pertinent question is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation." *Klen v. City of Loveland*, 661 F.3d 498, 511 (10th Cir. 2011) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (*abrogated by Pearson*, 555 U.S. at 231 (2009)) (quotation marks omitted).

Qualified immunity is immunity from the suit itself—not merely a defense to liability. *Pearson* 555 U.S. at 231 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Therefore, failure to satisfy either prong of qualified immunity, as articulated under *Soza*, results in a failure of the suit. *Hemry*, 62 F.4th at 1253.[7]

## THE TENTH CIRCUIT'S OPINION

---

[7] As the Tenth Circuit points out, it has the "'discretion to decide the order in which these two prongs should be addressed,' and need not address both." *Hemry*, 62 F.4th at 1253 (quoting *Soza*, 13 F.4th at 1099).

**I.      The Federal Defendants are entitled to qualified immunity on Mrs. Hemry's false arrest claim.**

The Tenth Circuit, on the issue of qualified immunity, reversed this Court's *Order* (ECF No. 31) and remanded. *See id.* Beginning with Mrs. Hemry's false arrest claim, it concluded that the investigatory detention did not escalate to an arrest. *Id.* The Tenth Circuit started its analysis by laying out the three kinds of police-citizen stops:

> (1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions—*Terry* stops—which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.

*Id.* (quoting *United States v. Hammond*, 890 F.3d 901, 904 (10th Cir. 2018) (quotation marks omitted).  At the outset, the Tenth Circuit found that the Federal Defendants had the requisite reasonable suspicion to make the stop, which as the Tenth Circuits points out is not an onerous standard; rather, it merely requires that the officer "maintain a 'reasonable suspicion supported by articulable facts that criminal activity may be afoot.'" *Id.* at 1254 (quoting *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007). The Tenth Circuit found that this threshold was easily met, for the rangers received, what they believed to be, a valid report that a fugitive was spotted in the park.

Since the initial stop was lawful, the Tenth Circuit then turned to whether the stop elevated into an arrest, first noting that, "[a]n officer can detain a suspect without arresting him. But clearly established law instructs that '[t]he scope of the detention must be carefully tailored to its underlying justification'" *Id.* at 1256 (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). In this inquiry, courts look to the law enforcement purposes to be

8

served by the stop and the duration of the stop. *United States v. Sharpe*, 470 U.S. 675, 685 (1985). The length of the stop is evaluated under a reasonability standard—that is, the court looks to "the time reasonably needed to effectuate [the purpose of the stop]" rather than any durational metric. *Id.*; *See Hemry*, 62 F.4th at 1256 ("[A]n evaluation of the reasonableness of a detention's length is not an exercise in counting minutes."). Courts also look to the means used during the stop, *i.e.*, whether the show of force was reasonable. *See Hemry*, 62 F.4th at 1254–55.

The Tenth Circuit conducted a "fact-intensive inquiry" to determine whether the stop in question progressed into an arrest. *Id.* at 1254. "When officers use 'firearms, handcuffs, and other forceful techniques,' a *Terry* stop escalates into an arrest unless" such measures were reasonable under the circumstances. *Id.* (quoting *Cortez*, 478 F.3d at 1115 (internal citation omitted)). The Tenth Circuit then looked to relevant caselaw to find an instance where an officer acting under similar circumstances was found to have violated the plaintiff's Fourth Amendment rights. *Id.* at 1256 (quoting *Wesby*, 583 U.S. at 64).

Under these standards, the Tenth Circuit found that: (1) the rangers had the requisite reasonable suspicion to stop Mrs. Hemry;[8] (2) the use of firearms and handcuffs did not

---

[8] *Id.* at 1254 ("The rangers easily cleared the reasonable suspicion hurdle. A park employee had contemporaneously reported that the man driving alongside Mrs. Hemry was a fugitive murderer. The rangers had no reason to doubt that representation. *See United States v. Copening*, 506 F.3d 1241, 1247 (10th Cir. 2007) (finding that an anonymous tip from an unknown caller in an unknown location gave rise to reasonable suspicion that a suspect possessed a firearm). While the employee's tip singled out Mr. Hemry, the rangers could not reasonably silo Mrs. Hemry from that determination. They had every reason to suspect that a man like Michael Bullinger would drive a well-defended vehicle, and that an unidentified passenger might not simply be along for the ride. The rangers had more than a hunch that Mrs. Hemry was or could be a collaborator or a hostage.").

lead to an arrest because such measures were reasonable under the circumstances;[9] (3) the

Plaintiff's and this Court's proffered caselaw materially differs from the facts in this case;[10]

and (4) the length of the detention was of a reasonable length in light of the nature of the

stop.[11] After making these findings, the Tenth Circuit concluded:

> Under the relevant caselaw, the rangers did not obviously use too much force
> in detaining Mrs. Hemry, nor did they obviously detain her for too long. As
> a result, the rangers would not have been on notice that they conducted an
> arrest rather than a *Terry* stop. And because we have no trouble finding that
> the rangers possessed reasonable suspicion to conduct the stop, we find that
> *the officers are entitled to qualified immunity as to Mrs. Hemry's alleged*
> *arrest.*

*Hemry*, 62 F.4th at 1257 (emphasis added).

## II.     The Federal Defendants are entitled to qualified immunity on Mr. and

### Mrs. Hemry's excessive force claims.

Next, the Tenth Circuit addressed Mr. and Mrs. Hemry's excessive force claims,

laying out the legal standard to determine whether an officer used excessive force: "We

assess excessive force claims under a 'reasonableness' standard." *Id.* at 1257. The Tenth

---

[9] *Id.* at 1255 ("Likewise, the rangers reasonably suspected they were confronting a fugitive triple-murderer accompanied by an unknown passenger. To be sure, the circulated report did not flag the presence of an adult passenger. But the report also did not indicate that Bullinger travelled alone. And given the matching vehicle and license plate number, it surely would have been unreasonable for the rangers to conclude they were free from danger.").

[10] *Id.* at 1255–56 ("The facts surrounding the rangers' stop differ materially. The *Maresca* officers threatened deadly force against a family (wrongly) suspected of occupying a stolen car. In *Maresca*, there was nothing about the circumstances of the underlying crime which indicated to officers that the occupants of the car may be armed. Here, the rangers had strong reason to believe the occupant of the vehicle they approached was dangerous, as they reasonably believed they were approaching a fugitive triple-murderer and, potentially, his unidentified accomplice or hostage.").

[11] *Id.* at 1256 ("The law did not clearly establish that Mrs. Hemry's detention took longer than 'reasonably needed to effectuate [the] purposes' of the stop. Fifty minutes is a long time to be detained, whether at gun point or in a police car. But an evaluation of the reasonableness of a detention's length is not an exercise in counting minutes. Instead, we probe the factual context and the detention's 'underlying justification.' That inquiry leads us to conclude that the officers would not have been on notice that they were violating Mrs. Hemry's rights by detaining her to wait for backup and identification.") (internal citations omitted).

Circuit then explained the *Graham* factors—*i.e.*, the test for reasonableness under the Fourth Amendment requiring a fact-intensive inquiry into the circumstances of the case. *Id.* at 1258. To this end, there are three factors courts use in analyzing whether a Fourth Amendment violation occurred "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Although, a *Graham* analysis is not always necessary in a qualified immunity excessive force case, the Tenth Circuit assumed, *arguendo*, that all the *Graham* factors were met and proceeded to apply the qualified immunity test. *Hemry*, 62 F.4th at 1258. That is, whether existing law or precedent put the question of constitutionality beyond debate. *Id.* The Tenth Circuit noted that "[i]t is the Hemry's burden to identify a case that established that 'every reasonable official' would have understood that pointing guns at both Hemrys constituted excessive force as to either or both given the apparent or reasonably suspected relationship between the two individuals." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).[12] Attempting to meet this burden, the Hemrys pointed

---

[12] "[O]ur cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, [] but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Creighton*, 483 U.S. at 640 (1987) (internal citations and quotation marks omitted).

to analogous caselaw in *Baker v. Monroe Township*[13] and *Tekle v. United Stated*;[14] the

Tenth Circuit found these cases markedly distinguishable from the instant case:

> *Baker* does not clearly establish that the rangers acted with excessive force because in *Baker*, "there [was] simply no evidence of anything that should have caused the officers to use the kind of force they are alleged to have used." Not so where the rangers reasonably suspected that they were approaching the subject of a manhunt and his unidentified passenger.
>
> The Hemrys also point to a Ninth Circuit case, *Tekle v. United States*. There, the court denied qualified immunity for officers who handcuffed and pointed guns at a fully compliant, unarmed eleven-year-old boy who was lying face down on the ground. It held that a reasonable officer would have known that such a use of force was excessive. We decline the Hemrys' invitation to draw a parallel between the eleven-year-old boy and the Hemrys. The Hemrys parked at some distance and the rangers could not be sure what weapons hid at the Hemrys' feet or sat on the console. A Ninth Circuit case does not suffice to put the rangers on notice that they used excessive force.

*Hemry*, 62 F.4th at 1258–59 (10th Cir. 2023) (internal citations omitted). The Tenth

Circuit then reviewed this Court's analysis and found it equally unpersuasive. *Id.* at

1259–60. This Court drew parallels between the instant case and *Maresca*[15] and

*Holland*[16] finding that these cases, in conjunction, satisfied both prongs of the

qualified immunity analysis. *See id.* The Tenth Circuit disagreed:

> The facts here do not clearly direct officers to take a different course based on these cases. In neither *Maresca* nor *Holland* did the officers have reason to anticipate deadly force from the plaintiffs. Those officers made outsized

---

[13] 50 F.3d 1186 (3d Cir. 1995).

[14] 511, F.3d 839 (9th Cir. 2007).

[15] *Maresca v. Bernalillo Cty.*, 804 F.3d 1301, 1312 (10th Cir. 2015) (finding that a family that was mistakenly stopped, ordered out of their vehicle at gunpoint, handcuffed, and placed into separate patrol cars escalated to an arrest and that the officer was not entitled to qualified immunity).

[16] *Holland ex rel. Overdorffv. Harrington*, 268 F.3d 1179, 1196–97 (10th Cir. 2001) (finding that SWAT officers that held plaintiffs, including children, at gunpoint for ten to fifteen minutes while executing an arrest warrant for a misdemeanor charge were not entitled to qualified immunity).

responses. By contrast, the rangers reasonably believed they were approaching a man evading arrest for triple homicide. To be sure, they also lacked information concerning Mrs. Hemry's potential dangerousness. But whether she was a co-conspirator or a hostage, the rangers could reasonably fear that she would act in Mr. Hemry's interest and could have access to any weapons Mr. Hemry might have possessed. And, again, Mr. Hemry was wanted for murder: it was reasonable to suspect that his car harbored weapons. The rangers' reaction here was proportional, and neither the district court nor the Hemrys cite any case law that suggests otherwise.

*Hemry*, 62 F.4th at 1259. After distinguishing *Maresca* and *Holland*, the Tenth Circuit concluded that the Hemrys did not meet "their burden of demonstrating that the law clearly established the rangers acted with excessive force as to either Hemry. And we cannot 'identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment.'" *Id.* (quoting *Wesby*, 583 U.S. at 64).

## STATE AND FEDERAL DEFENDANTS' MOTIONS

Following the Tenth Circuit's decision, both State Defendants and Federal Defendants filed motions—ECF No. 65 and ECF No. 69, respectively. Both motions will be addressed in turn:

### I.      State Defendants' Motion for Judgment on the Pleadings

Pursuant to the Tenth Circuit's opinion, State Defendants ask this Court for "judgment on the pleadings based on an affirmative defense pled in their answer—qualified immunity." ECF No. 66 at 6. State Defendants argue they have qualified immunity on (1) Mrs. Hemry's false arrest claim; (2) Plaintiffs' excessive force claims (including the claims of F.M.H.); and (3) any alleged failure to intervene claim. *See id.* 7–13.

### A.      *Mrs. Hemry's False Arrest Claim*

Here, the bulk of State Defendants' arguments are a recitation of the Tenth Circuit's opinion. *Id.* at 7–10. In essence, State Defendants argue that they were in the same position as the Federal Defendants, and because the Tenth Circuit found the Federal Defendants were entitled to qualified immunity they too should be entitled to that defense. *Id.* at 9. They argue that "[t]heir use of force was less—not more—severe than that of the Federal Defendants." *Id.* And as such, they are entitled to qualified immunity and judgement on the pleadings:

> The State Defendants were also involved in only a portion of the alleged fifty-minute detention upheld by the Tenth Circuit Court []. Based on the analysis in *Hemry*, the State Defendants (like the Federal Defendants) were not on notice that Ms. Hemry's detention had ripened into an arrest. Like the Federal Defendants, the State Defendants had reasonable suspicion to detain Mrs. Hemry. The State Defendants are therefore entitled to qualified immunity and judgment on the pleadings on her false arrest claim.

*Id.* at 9–10 (citing *Hemry*, 62 F.4th at 1256–57) (internal citations omitted). Based upon the Tenth Circuit's reasoning in *Hemry*, the Court finds that State Defendants, just as the Federal Defendants, are entitled to assert qualified immunity as to Mrs. Hemry's false arrest claim. Further, the Court finds that State Defendants are entitled to qualified immunity on Mrs. Hemry's false imprisonment claim as well.[17]

### B.    *Plaintiffs' Excessive Force Claims*

Next, State Defendants argue they are entitled to qualified immunity on Plaintiffs' excessive force claims including F.M.H. *Id.* at 10. Again, State Defendants recite the Tenth

---

[17] As State Defendants correctly note, false imprisonment claims are a species of false arrest claims: "False arrest and false imprisonment overlap; the former is a species of the latter." *Wallace v. Kato*, 549 U.S. 384, 388 (2007). As such, this Court previously held that Plaintiffs' false arrest and false imprisonment claims would be addressed together. ECF No. 31 at 17.

Circuit's reasoning and argue that they "are not alleged to have done anything more than the Federal Defendants did in this case." *Id.* And by virtue of this, they assert that they are entitled to qualified immunity. Based on the Tenth Circuit's reasoning, we agree with State Defendants; they are entitled to qualified immunity on Mr. and Mrs. Hemry's excessive force claims. However, F.M.H.'s excessive force claim against State Defendants, will be addressed in a forthcoming section.

### C.      *Failure to Intervene Claim*

This Court previously held that named Defendants were not entitled to qualified immunity on the failure to intervene claim. ECF No. 31 at 20 n.8. The Court's reasoning was based upon our since overruled decision that held Defendants were not entitled to qualified immunity on all claims. *Id.* As the Court noted in that *Order* (ECF No. 31), "it is clearly established 'that a law enforcement official who fails to intervene to prevent another law enforcement officer's use of excessive force may be liable under § 1983.'" *Id.* (quoting *Maresca*, 804 F.3d at 1314. But in any failure to intervene claim, the officers must be on notice that a constitutional violation is occurring and must have a realistic opportunity to intervene. *Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015). State Defendants point to *Jones v. Norton* which states that "in order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation[.]" *Id.* (quoting *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2015). Here, since the Defendants are entitled to qualified immunity there exists no underlying constitutional violation upon which a failure to intervene claim could be based. As such, the Court finds the State Defendants are entitled

to judgment on the alleged failure to intervene claims, and the Court finds those claims are dismissed.

## II.     Federal Defendants' Motion to Dismiss

Federal Defendants' *Motion to Dismiss* (ECF No. 69), points to the Tenth Circuit's decision in *Hemry* and correctly posits that only one claim remains:

> The Tenth Circuit Court of Appeals [held] that the rangers had reasonable suspicion to make a *Terry* stop, that their use of firearms during that stop was reasonable, and that Ross and Azizian were entitled to qualified immunity on Mrs. Hemry's false arrest/imprisonment claim, as well as both Mr. and Mrs. Hemry's excessive-force claims. Thus, the only remaining claim in this case is F.M.H.'s excessive-force claim.

ECF No. 70 at 4 (citing *Hemry*, 62 F.4th at 1248). This Court adopts the Tenth Circuit's findings of qualified immunity as to Federal Defendants. That is, Federal Defendants are entitled to qualified immunity as to Mrs. Hemry's false arrest claim and Mr. and Mrs. Hemry's excessive force claims meaning those claims are now dismissed. This leaves only F.M.H.'s excessive force claim.

### A.  F.M.H.'s Excessive Force Claim

Federal Defendants and State Defendants ask this Court to dismiss F.M.H.'s excessive force claims for differing reasons. *Id.*; ECF No. 66 at 11–12. The former argues that the Supreme Court, most recently in *Egbert v. Boule*,[18] has limited the application of *Bivens* in this matter, and the latter argues that Plaintiffs have failed to name the defendant in question, failed to allege that the unidentified defendants knew F.M.H. was in the

---

[18] 142 S. Ct. 1793 (2022)

vehicle, and failed to provide caselaw "holding that it is unlawful for an officer to point his firearm at a vehicle in such circumstances." ECF No. 70 at 5–6; ECF No. 66 at 12.

### i.    *Excessive Force Under Bivens*

As a general proposition, a *Bivens* claim arises when a plaintiff alleges that a federal officer—acting under the color of federal authority—has violated their constitutional rights. *See Bivens*, 403 U.S. at 389. The Supreme Court has recognized a damages remedy in Fourth Amendment,[19] Fifth Amendment,[20] and Eighth Amendment cases.[21]    The Supreme Court has not gone beyond these three causes of actions, and it cautions "that recognizing a cause of action under *Bivens* is 'a disfavored judicial activity.'" *Egbert*, 142 S. Ct. at 1803 (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017). And the Tenth Circuit has added, in no uncertain terms, that the expansion of *Bivens* is not just disfavored, but "it is an action that is impermissible in virtually all circumstances." *Silva v. United States*, 45 F.4th 1134, 1140 (10th Cir. 2022) (citing *Egbert*, 142 S. Ct. at 1803–07).  Just as the Tenth Circuit did in *Silva*, this Court too shall "heed the Supreme Court's warning and decline Plaintiff's invitation to curry the Supreme Court's disfavor by expanding *Bivens* to cover [this] claim." *Silva*, 45 F.4th at 1136.

---

[19] *Bivens*, 403 U.S. at 389.

[20] *Davis v. Passman*, 442 U.S. 228 (1979) (holding that *Bivens* could be extended to a Fifth Amendment Due Process claim made by a former congressional aide against her former employer for discrimination).

[21] *Carlson v. Green*, 446 U.S. 14 (1980) (holding that *Bivens* could be extended to an Eighth Amendment Cruel and Unusual Punishment Clause stemming from a prison officials indifference to the medical needs of a prisoner).

In *Silva*, the Tenth Circuit endeavored to distill the implications of *Egbert* for *Bivens* analysis. *See Silva*, 45 F.4th at 1137–38.[22] "[W]e emphasize what we view as the key takeaway from *Egbert*, namely, that courts may dispose of a *Bivens* claims for 'two *independent* reasons: Congress is better positioned to create remedies in the [context considered by the court], and the Government already has provided alternative remedies that protect plaintiffs.'" *Id.* at 1141 (quoting *Egbert*, 142 S. Ct. at 1804) (alterations and emphasis in original).

Using the *Egbert* framework, the Court can now conduct the *Bivens* analysis. In this matter, "Plaintiffs invite this Court to extend *Bivens* to a new Fourth Amendment context, namely, a claim against National Park Service Rangers for excessive-force used during a roadside *Terry* stop." ECF No. 70 at 8. As Federal Defendants correctly point out, a claim is different from a recognized *Bivens* claim if it differs in some meaningful way. *Id.* The fact that *Bivens* and the claim at bar are both rooted in the Fourth Amendment is not dispositive in the "new context" inquiry, for "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which damages remedy was previously recognized." *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020). The Supreme Court has not recognized excessive force claims under *Bivens*, and such "superficial similarities are not enough to support the judicial creation of a cause of action." *Egbert*, 142 S. Ct. at 1805.

---

[22] "We consider this case in the aftermath of the Supreme Court's recent decision in *Egbert v. Boule*, which purports to alter the *Bivens* analysis. Though the decision was only handed down recently, courts within our Circuit have already had to grapple with it and have noted our lack of guidance on how to do so appropriately."

Here, the Court finds that Plaintiff's claim presents a new context—both in the claim itself (excessive force) and the category of defendant (federal park rangers). So, the Court now turns the two independent means of disposing of a *Bivens* claim. *See Silva*, 45 F.4th at 1141. Applying *Egbert*, the Court finds that the government has already provided an alternative remedy for Plaintiffs. As the Supreme Court held in *Egbert*, an administrative grievance procedure was an alternative remedy that served as the means to dispose of the *Bivens* claim. *Egbert*, 142 S. Ct. at 1806–07. The Supreme Court stated:

> So long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, *the courts cannot second-guess that calibration by superimposing a Bivens remedy*. That is true even if a court independently concludes that the Government's procedures are "not as effective as an individual damages remedy."

*Id.* at 1807 (quoting *Bush v. Lucas*, 462 U.S. 367, 372 (1983) (emphasis added)). In this case, Federal Defendants contend that an administrative remedy is already available to Plaintiffs, and by virtue of that remedy, the Court is not permitted to expand *Bivens*. ECF No. 70 at 16. The Court agrees. As Federal Defendants note, the Department of Interior ("DOI") has "both regulations and internal administrative processes to review and discipline Park Service employees." *Id.* They go on, laying out the procedures one would use to file a complaint against a park ranger. *Id.* at 17. An aggrieved party may "file a complaint with the [NPS's] Office of Professional Responsibility[, or]…they [may] file a complaint through the [DOI's] Office of Inspector General…." *Id.* As the Supreme Court noted in *Egbert*, it is not a court's place to opine on the merits of the remedy Congress or the Executive have created; rather, the courts must abide what those branches of government deem satisfactory. *Egbert*, 142 S. Ct. at 1806–07. Here, the Court finds that a

19

*Bivens* remedy is unavailable because the DOI and NPS have alternative administrative grievance processes in place. *See id.*[23] As such F.M.H.'s excessive force claim against Federal Defendants is dismissed.

Since a remedy is already provided by the Government—meaning one of the two *independent* means of disposing of a *Bivens* claim is met—the Court will not conduct an analysis as to whether Congress is better situated to provide a remedy for the Plaintiffs in this matter, but in light of the waning scope of *Bivens*, the Court is convinced that Congress is almost always in a "better position[] to create remedies" when a new context claim arises under *Bivens*. *See Silva*, 45 F.4th at 1140.

### ii.      *F.M.H.'s Excessive Force Claim as to State Defendants*

State Defendants assert that they are entitled to qualified immunity as to F.M.H.'s excessive force claim. ECF No. 66 at 11. Excessive force claims, as previously discussed, are analyzed under the Fourth Amendment's "objective reasonableness" standard. The Court looks to "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to underlying intent or motivation." *Graham*, 490 U.S. at 397.

In the *Complaint*, Plaintiffs allege that while Mr. and Mrs. Hemry were detained in separate vehicles, "an armed defendant continued to point a long gun at the minor child F.M.H., who remained in the family car." ECF No. 1 at 9. As State Defendants point out, the *Complaint* "does not allege that the 'armed defendant' (or any other defendant) knew

---

[23] In *Egbert*, the Supreme Court found that the Border Patrol's internal grievance process was sufficient, foreclosing the expansion of Fourth Amendment relief under *Bivens*.

F.M.H. was in the car." ECF No. 66 at 12. The Tenth Circuit also recognized that although

F.M.H. remained in the vehicle, it was "unclear whether [the officers] spotted her, or

simply kept a gun trained at the vehicle." *Hemry*, 62 F.4th at 1257 n.2. Even if the

unidentified officer saw that F.M.H. was in the vehicle, the Tenth Circuit has held that

pointing a firearm at a suspect after a lawful stop, without more, does not amount to

excessive force. *See Henry v. Storey*, 658 F.3d 1235, 1240–41 (10th Cir. 2011). In this

case, the Tenth Circuit found that it was reasonable for the officers to suspect that there

may be weapons or other threats lingering in the car even after Mr. and Mrs. Hemry were

handcuffed and confined to separate vehicles:

> [I]t would not have been clear that the danger had passed. An officer could
> reasonably suspect that an unrecognized threat remained hiding in the
> vehicle, especially after discovering an unexpected passenger, Mrs. Hemry,
> accompanying the suspect. *See Maryland v. Wilson*, 519 U.S. 408, 413, 117
> S.Ct. 882, 137 L.Ed.2d 41 (1997) ("[T]he fact that there is more than one
> occupant of the vehicle increases the possible sources of harm to the
> officer."). It would not have been clearly unlawful for the rangers to take 20
> minutes to "dispel their suspicions" that some unrecognized danger lurked in
> the car before turning to identify the apprehended suspects. *Sharpe*, 470 U.S.
> at 686, 105 S.Ct. 1568; *see also Terry*, 392 U.S. at 23, 88 S.Ct. 1868
> ("Certainly it would be unreasonable to require that police officers take
> unnecessary risks in the performance of their duties.").

*Hemry*, 62 F.4th at 1257. Further, because State Defendants have raised the defense of

qualified immunity, the Plaintiff is tasked with establishing that the right to be free from

excessive force would have been "sufficiently clear [so] that a reasonable official would

understand what he is doing violates that right." *Anderson*, 483 U.S. at 640. Based upon

the findings of the Tenth Circuit, and the lack of caselaw from the Plaintiffs demonstrating

that the officers would have been on notice they were violating F.M.H.'s Fourth

Amendment rights, we find that the State Defendants are entitled to qualified immunity as to F.M.H.'s excessive force claims. Therefore, F.M.H.'s excessive force claims against State Defendants are hereby dismissed.

## CONCLUSION

Therefore, IT IS ORDERED, Federal Defendants' *Second Motion to Dismiss* and State Defendants' *Motion for Judgment on the Pleadings* are both GRANTED.

Dated this __12th__ day of October, 2023.

Alan B. Johnson
United States District Judge